[Civ. No. 16199.   Second Dist., Div. Three.   June 7, 1948.]

Estate of WILLIAM J. TERSIP, Deceased. PAUL HENSLEY, Respondent, v. JEANNE E. TERSIP, Appellant.

Weinstein & Bertram for Appellant.

G. V. Cutler for Respondent.

SHINN, Acting P. J.—This is an appeal by Evelyn Jeanne Tersip from an order revoking letters of administration theretofore granted to her as administratrix of the estate of William J. Tersip, deceased, removing her as administratrix and ordering her to produce and file any and all wills of said decedent, if any there be.

The order was made after hearing had upon a petition filed by one Paul Hensley, a nominee of a niece of decedent. The basis for the petition and the order was that appellant had been appointed pursuant to her application for letters in which she alleged herself to be the surviving wife of decedent, whereas, in fact, she was not the wife of the decedent or related to him, but was the wife of one Robert G. Roberts. The proof of the petition tended to establish a common law marriage between appellant and said Roberts in the State of Minnesota, contracted some time during the period from 1933 to 1935. Appellant denied the common law marriage and testified that she was married to William J. Tersip in Tiajuana, October 23, 1942. The trial court found that appellant is the common law wife of said Roberts, that she was never legally married to Tership, and that when she filed her petition for letters of administration she knew that she was not the surviving spouse of said decedent.

The finding that appellant was not legally married to Tership, broadly interpreted as it should be in support of the order, should be construed as a finding that there was no marriage ceremony as testified to by appellant. Her testimony was that Tership took her to Tiajuana in October, 1942, where he introduced a man to her as a priest; there was a

ceremony conducted in broken English which she did not understand; that she did not think it was in a church; that the man signed what he said was a certificate of marriage, that she signed it and that she did not know what had become of it; that both she and Tership were Catholics and could not be married in a Catholic church, and that she thought the ceremony was performed in a residence but did not know its location. One Mikulcic, an acquaintance of decedent, testified that in the fall of 1941, he visited decedent in the La Brea Sanitarium; that Tership told him at that time that he and appellant intended to be married in Tiajuana; that about three days after that appellant and Tership came to his house, took him out to dinner, appellant had a ring which she showed him, and Tership said they had been married in Tiajuana. No documentary or other evidence was produced in support of appellant's claim that she had married Tership, nor was there evidence that any effort had been made to locate a record of the marriage in Tiajuana. Appellant's account of the marriage was extremely casual and, in view of her lack of interest to produce a record of it, was unconvincing. A statement of identity signed by Tership for the benefit of a title company was received in evidence. It stated that he and appellant were married in Mexico City, October 15, 1942. Appellant had come to California from Minnesota in 1937, and in April, 1939, had established the Glen Braw Sanitarium in Los Angeles. Tership was an employee in her sanitarium but had no interest in it. About January, 1941, she and Tership opened a joint bank account in the names of William J. or Jeanne E. Tership. In 1945, real estate was conveyed to them in joint tenancy but it had been sold prior to the death of Mr. Tership, and reference was made in the testimony to other property which had been conveyed to them in like manner. While there was no express finding that the alleged ceremony of marriage was not performed in Tiajuana, we are obliged to imply one from the finding that appellant was not legally married to Tership. We must therefore assume that the court did not believe the testimony of appellant and rejected as unsatisfactory the evidence respecting that marriage ceremony. On this ground alone we would be obliged to affirm the order.

There was also, in our opinion, sufficient evidence to justify the finding that appellant had contracted a common law marriage with Roberts in Minnesota, and that it had not

been dissolved. She testified to the following facts: She had been married before to a man named Wirth, by whom she had three children. She first met Roberts at Breezie Point, Minnesota, in 1929. He was the superintendent of a large resort and appellant was employed by him for the season as a cook. Except for three summer months Roberts was in railroad work. Appellant saw him from time to time until 1932, when he was in a hospital with a broken leg and appellant went to see him. In the meantime she had taken up nursing. She was unemployed at the time, her three children were with her former husband, and Roberts employed her for $75 per month to keep house for him and nurse him. There was no evidence that this arrangement was continued or that she was paid for her services. Before he left the hospital Roberts was transferred to Hastings, Minnesota, and at his request appellant went to Hastings and rented a house, arranged to have his furniture moved and to set up housekeeping when he should leave the hospital. Hastings was a small town where Roberts was well known, and at Roberts' suggestion it was agreed that they would let the general public believe that they were married. They moved into a two-story house with one bedroom on the first floor and three on the second floor. This was the home of Roberts, appellant and her three children, for some two years. Appellant did not tell anyone in Hastings that they were not married, except a priest and one friend of hers, a Mrs Drum. The home in Hastings was rented by appellant under the name of Mrs. Fred Roberts, and she used a railroad pass issued to Mrs. Fred Roberts. She opened her sanitarium in Los Angeles under the name of Jeanne E. Roberts and when Roberts came to California in 1939, appellant, with the assistance of a doctor, gained him admittance to Rancho Los Amigos, a public institution. She was listed on the records there and known as the wife of Roberts, visited him frequently, and in corresponding with him signed herself Jeanne Roberts. In explanation of her procuring his admittance to the hospital she stated: "I know he was at a private sanitarium and it was costing me so much money I couldn't keep it up."

Witnesses in Hastings testified by deposition to the residence of appellant with Roberts for some two years, that appellant introduced Roberts as her husband and was generally known as Jeanne Roberts. She attended to Roberts' business and cashed his checks under that name. Among the witnesses

were their landlord in Hastings, a tradesman and other intimate acquaintances. It was satisfactorily proved that the parties lived together ostensibly as husband and wife and were generally reputed to be such.

Common law marriages were then recognized in Minnesota. According to the decisions in that jurisdiction, the evidence was sufficient to justify an inference that appellant and Roberts had entered into an oral contract of marriage in the early stages of their cohabitation.

"When the fact of marriage is required or offered to be proved before any court, evidence of the admission of such fact by the party against whom the proceeding is instituted, or of general repute, or of cohabitation as married persons, or any other circumstantial or presumptive evidence from which the fact may be inferred, shall be competent." (2 Mason's Minn. Stats., 1927, § 9899.)

"The essence of the contract of marriage is the consent of the parties, as in the case of any other contract; and, whenever there is a present, perfect consent to be husband and wife, the contract of marriage is completed. The authorities are practically unanimous to this effect. . . . The whole law on the subject is that, to render competent parties husband and wife, they must and need only agree in the present tense to be such, no time being contemplated to elapse before the assumption of the status. If cohabitation follows, it adds nothing in law, although it may be evidence of marriage. It is mutual present consent, lawfully expressed, which makes the marriage." (*In re Hulett's Estate*, 66 Minn. 327 [69 N.W. 31, 61 Am.St.Rep. 419, 34 L.R.A. 384].)

"It involves generally living together as husband and wife in the same habitation, so that where one lives and dwells, there the other lives and dwells; but there must, generally speaking, be something more than mere living together; there must be an association consciously and openly, as husband and wife." (35 Am.Jur. p. 328.)

"Where there is no proof of any express written or oral agreement, there must be evidence of cohabitation as man and wife, or the assumption openly of marital duties and obligations, continued for such time and to such an extent as to reasonably sustain the conclusion or inference that the parties have agreed to become and be husband and wife. The cohabitation and conduct must be of some continuance and such as is usual between persons lawfully married."

(*Ghelin* v. *Johnson (In re Lust's Estate)*, 186 Minn. 405 [243 N.W. 443].) A finding that a marriage was proved under the Minnesota law by evidence not unlike that which is before us was sustained in *Wilson* v. *Wilson*, 139 Neb. 153 [296 N.W. 766].

The finding that appellant was the wife of Roberts at the time of her alleged marriage to Tersip is supported by the facts proved and the law of Minnesota which governed at the time.

We do not doubt that appellant's wrongful assertion of claims to the rights of a surviving wife, based upon her false representation of widowhood was a ground upon which the court was empowered to remove her under section 521, Probate Code, as one who had committed or was about to commit a fraud upon the estate. The word "fraud" as used in the section should be given its broadest meaning. It would apply to the conduct of appellant in the capacity of administratrix. It is not necessary that actual fraud has been, or is about to be committed. The court must exact of an administrator or executor the ultimate in the performance of fiduciary duties and should be satisfied with nothing less. An administrator who asserts false claims against the estate to the prejudice of others interested in the estate is guilty of constructive fraud. We cannot deny the power of the court to remove its representative whose self-interest stands in the way of a fair and impartial representation of the rights of all other claimants to an estate in probate. When that self-interest has once been asserted the court may properly assume that it will continue to be asserted, and may act accordingly. For this reason it may remove an administrator when it appears that constructive fraud, consisting of breaches of fiduciary duty, are about to be committed. It was to be assumed that appellant would not protect the rights of others in the estate against her own claims. Such continuing conflict of interest, especially where the claims of appellant were unfounded, rendered her unfit to serve as administratrix and the threatened breach of duty was properly forestalled by the order of removal.

Since we uphold the statutory power of the court to remove appellant, for the reasons stated, it is unnecessary to decide whether, independently of the statute, there is power to remove an executor or administrator whenever such action appears necessary for the protection of the estate or the courts.

(See *Luckey* v. *Superior Court,* 209 Cal. 360, 370 [287 P. 450]; *Koury* v. *Castillo,* 13 N. M. 26 [79 P. 293, 294]; *Ross* v. *Pitcairn* (Mo.), 179 S.W.2d 35, 37; *Estate of Bell,* 135 Cal. 194, 196 [67 P. 123]; *Estate of Palm,* 68 Cal.App.2d 204, 212 [156 P.2d 62].)

Finally, it must be understood that we are not affirming the order as one which vacated the order of appointment. The proceeding was one for removal, and the parties have treated it as such. The question is not raised whether it could also be regarded as an attack upon the validity of the first order, and we do not consider that point.

The order is affirmed.

Wood, J., and Vallée, J. pro tem., concurred.